BROWN v. HUNTINGTON PIANO CO.

(Circuit Court, D. Connecticut. July 6, 1904.)

No. 1,114.

1. PATENTS—INVENTION—MUSIC DESKS FOR PIANOS.

The Brown patent, No. 468,077, for improvements in music desks for pianos, consisting of a device by which the opening and closing of the fall-board automatically opens and closes the music desk, and, when open, locks it in position for use, by means much better, because simpler, than those previously used for the purpose, discloses patentable invention; the simplification of such means having been an object sought for years by other inventors. Claims 1 and 2 also *held* infringed.

In Equity. Suit for infringement of letters patent No. 468,077, for improvement in music desks for pianos, granted to Theodore P. Brown February 2, 1892. On final hearing.

Southgate & Southgate, for complainant.

Roberts & Mitchell, for defendant.

PLATT, District Judge. This suit is based on letters patent to complainant, granted February 2, 1892, for "improvements in music desks for pianos," charging infringement and asking the usual relief. It is too plain for denial that the defendant infringes, if the patent is valid. The only defense is lack of invention. Claims 1 and 2 are in suit:

"(1) In a piano, the combination, with the case provided with a ledge, of a substantially L-shaped fall-board pivotally secured near its base within the case substantially below the front edge of the ledge, each arm or portion of the board being adapted to pass under the ledge, and thereby close the space between the ledge and the keys when it is closed or open, a lever pivotally secured at the rear of the fall-board, with its lower end entirely disconnected from, but in the path of and adapted to be engaged by the upper portion of the fall-board when the fall-board is opened, and a music desk in the front of the case, adapted to be operated by the lever, substantially as set forth.

"(2) In a piano, the combination, with the case, of a substantially L-shaped fall-board pivotally secured therein near its base, the front portion of the board being hinged and adapted to be folded so as to pass under the ledge of the case and close the space between the ledge and the keys, whether the fall-board be open or closed, a lever pivotally secured at the rear of the board, the lower end of which is inclined and projects towards the board, and is adapted to be engaged by and forced back by the upper portion of the fall-board, said upper portion of the board being in a straight line between the end of the lever and the hinge of the board, whereby the lever is locked in its rear position, and a music desk in the front of the case, adapted to be operated by the lever, substantially as set forth."

Looking at the prior art, we find that the L-shaped fall-board was old, and is substantially shown in patent to Neill, No. 183,773, dated October 31, 1876. A music desk, hinged at the top, which could be inclined outward and firmly held in position, so that music could be rested upon it, was old, as shown in patent to McCammon, No. 219,821, dated September 23, 1879. It was obvious that, when the fall-board was closed upon the keys, there was no advantage in having the music desk remain in position for use, and so the problem was to furnish simple automatic action by which the opening of the fall-board should open the music desk, and retain it securely in position for use, and by which the closing of the fall-board would permit the music desk to close. There were

131 F.—18

many ways of making fall-boards, and this fact may have added to the confusion which followed; but it at last became settled that fall-boards practically of the Neill type were the best, and they are now in general use, and are called in trade the "Boston Fall-Board." The simple connection now in suit, between fall-board and music rack, is known to the trade as the "Kicker." The first person to attack the problem was Charles E. Bourne, of Boston, in patent 247,473, September 27, 1881; but he concocted a peculiar type of fall-board, which was a necessity in his combination, and the result was a very complicated affair, objectionable for many reasons. Before that patent issued, however, an attempt at improvement was jointly essayed by Mr. Bourne and a namesake, William, and patent No. 247,474 was also granted to them on the same date; but the improvement would seem to have intensified, rather than simplified, the complication. The objections to the Bourne structures may be thus stated: In effecting automaticity it was necessary (1) to discard the L-shaped fall-board; (2) to provide the floating inner part of the fall-board with a guiding mechanism, consisting of links and hinges, so that it might follow and lock the lever; (3) in the attempt at simplification, the rear end of the fall-board must be positively connected and hinged to obtain the coveted result. After the Bournes came Felldin, No. 307,933, November 11, 1884. He had a compound fall-board, of which the inner part slid downward and forward in grooves, while it oscillated on pivots which acted upon a lever with which before moving it was in contact; the upper part being a bent rod or coarse wire. When all was done, the locking does not appear to have been provided for. Ivers, 371,069, October 4, 1887, had a sliding fall-board, which was locked in place by a catch after acting upon the lever. There are also two organ constructions shown by drawings. In these seven devices the simple, pivoted, L-shaped fall-board is either lacking, or much modified to obtain what was wanted; and, if any of them locked, it was brought about by a floating rear portion provided with guiding mechanism connections and hinges, unnecessarily complicated, to follow the movement of the lever. In this situation, we come to Harper and Hoover, 372,616, November 1, 1887. Here the L-shaped, pivoted fall-board was used as the first element of the combination. The complicated mechanism employed in connecting it with the music desk can only be appreciated by reading the specifications of that patent. It probably serves to lock the desk when the fall-board is open, and to take up lost motion, thus avoiding jar or rattle, and, by the help of springs, will return the music desk to its normal position when the fall-board is closed, but it is painful to see the conglomerated series of devices by which the result is reached.

Such was the art prior to Brown. He took the old fall-board, the old music rack, and the old lever, and so arranged them that they entered into new co-operative relations, and produced an old result in a better, because simpler, way. The gist of his invention will be found by an examination of his specifications. I quote only a little part of them:

"The lower end of the lever is entirely disconnected from the fall-board, and has its front portion inclined toward the board, so that, when it is forced back by the upper portion of the board, it swings downward until it is substantially on a horizontal line with the hinge of the fall-board. This permits of the upper portion of the fall-board assuming a substantially horizontal posi-

tion between the hinge and the lower end of the lever, which locks the lever in its rear position, and also prevents the pressure of a heavy book upon the rack from moving the lever and closing the fall-board over the keys."

And so the simple connection becomes a disconnected, pivotally secured lever at the rear of the fall-board, in the path of and adapted to be engaged by the upper portion of the fall-board when it is open. The movement of the part of the fall-board which engages the lever is about a remote center from the pivot of the lever, and its path is of the opposite curvature to the path of the lever with which it engages. A wiping action therefore occurs, which ends in positive engagement of fall-board and lever at or near a dead center; resulting in locking, absorption of lost motion, and consequently freedom from jar or rattle. The piano can be taken apart and put together easily, connecting devices are unnecessary, and springs are eliminated. By this simple method the problem was solved, with a perfection which is ideal. It may excite surprise that Harper and Hoover, after recognizing the best style of fall-board, did not find the answer; but he who is surprised must remember the morass in which the inventors were floundering. Simple as the solution appears now, we must try to square our minds with those who struggled then. The court would be loath to charge the skilled mechanics of all the large piano manufacturing concerns of the country for about 15 years with imbecility, and yet that conclusion is inevitable if it is assumed that mechanical skill is the limit of the Brown structure. This is not an epoch-making invention. Its domain is limited. Its presence may furnish the feather's weight which, tossed into the scale, might direct the purchaser's choice; but, under the rules laid down in the mass of decided cases, I am compelled to find that inventive thought existed.

Every presumption is against the defense. The patent itself, after the careful scrutiny which it received in the office; its acknowledged merit, evidenced by its acceptance in the trade; the futile struggle of inventive minds for so many years—all argue against it. The climax is reached when the piano trade, recognizing the value of the invention, combines to defeat the contract which the government has entered into with one of its citizens. That trade plainly considers the "kicker" a thing which no well-ordered piano may omit, and prefers to pay tribute to counsel, rather than to the lawful owner. This court refuses to become privy to an act which seems to be nothing less than an attempt at unrighteous appropriation. The contract was made with wide-open eyes, and ought to be enforced.

Let the usual order be entered for an injunction and accounting.